UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DEAN HIGGINS;

     Plaintiff,

     v.                 Case No.:  4:19cv308

MARK S. INCH, in his official
capacity as Secretary of the Florida
Department of Corrections; MARK
JONES; OFFICER T. JOHNSON;
OFFICER S. WICKER; JASON
SCHUENEMAN; and OFFICER
LANDERS;

     Defendants.

_____ /

## COMPLAINT

Plaintiff Dean Higgins ("Higgins") sues Defendants Mark S. Inch ("FDOC")

in his official capacity as Secretary of the Florida Department of Corrections; Mark

Jones; Officer T. Johnson; Officer S. Wicker; Jason Schueneman; and Officer

Landers and alleges as follows:

## INTRODUCTION

1.     Higgins had epilepsy when he was admitted to prison and experienced

an epileptic seizure on Sept. 27, 2018, while at DeSoto CI.  During this epileptic

seizure, he reportedly bit Officer Jessica Tirado.  Instead of viewing this incident

as an involuntary act, untrained prison officials battered Higgins.  Furthermore,

because of his disability, prison officials placed in him isolation for his last 7½

months in prison.  The prison officials' response was unlawful and unjust.

### JURISDICTION & VENUE

2.      Plaintiffs bring this action pursuant to (a) 42 U.S.C. § 1983, for

violations of civil rights under the Eighth and Fourteenth Amendments to the

United States Constitution; (b) Title II of the Americans with Disabilities Act, as

amended, *see* 42 U.S.C. § 12101 *et seq*., (hereinafter the "ADA"); (c) Section 504

of the Rehabilitation Act of 1973, as amended, *see* 29 U.S.C. § 794 *et seq*.

(hereinafter the "Rehabilitation Act"); and (d) state common law.

3.      This Court has subject-matter jurisdiction over this matter pursuant to

28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(a)(3) (civil rights); and 28

U.S.C. § 1367 (supplemental jurisdiction).

4.      Venue is proper in this judicial district and division pursuant to 28

U.S.C. §1391(b)(1).  Defendant FDOC resides in this district and division.  All

Defendants are residents of Florida.

### PARTIES

5.      Plaintiff Dean Higgins ("Higgins") was formerly detained in prison by

FDOC from June 9, 2017, through May 10, 2019.  During this entire time—and at

all material times—FDOC had custody and control of Higgins.  Accordingly,

Higgins was subject to the policies, practices, and customs of FDOC.  He is currently on felony probation administered by FDOC.

(a)     At all times material, Higgins lived with epilepsy and autism, and accordingly was and is a person with a disability as defined by the ADA and the Rehabilitation Act.

(b)     At all times material, Higgins has experienced and experiences episodic epileptic seizures—he does not continually have them.  *See* 42 U.S.C. § 12102(4)(D).  When Higgins had and has an epileptic seizure, his physical or mental impairments from epilepsy substantially limits one or more of his major life activities, including but not limited to caring for himself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, learning, reading, concentrating, thinking, communicating, and working.  *See* 42 U.S.C. § 12102(2)(A).

(c)     At all times material, Higgins has lived with Autism Spectrum Disorder ("Autism"). Autism is a neurodevelopmental disorder that is characterized by persistent deficits in social communication and social interaction across multiple contexts, inflexible adherence to routines, and hyper-reactivity to sensory input.  Autism is a disability pursuant to the ADA and Rehabilitation Act.

6.      Defendant Mark S. Inch ("FDOC") is the Secretary of the Florida Department of Corrections.  He is sued in that official capacity.  He is responsible for the operation of Florida's prison system, including compliance with the Constitution and federal laws.

(a)      At all material times, FDOC was a "public entity" for purposes of ADA.  *See* 42 U.S.C. § 12131(1).

(b)      At all material times, FDOC "receive[d]" federal financial assistance for services, programs, or activities.  *See* 29 U.S.C. § 794(a).

(c)      The alleged violations of the ADA and Rehabilitation Act were committed by FDOC's agents and employees while acting within the course and scope of their employ and/or agency with FDOC.  Thus, FDOC is vicariously liable for their actions or inactions.

7.      Defendant Mark Jones ("Warden Jones" or "Jones") was at all material times the Warden of DeSoto Correctional Institution ("DeSoto CI") in DeSoto County, Florida.  He is sued in his individual capacity.

8.      Defendant T. Johnson ("Off. Johnson") was at all material times a corrections officer for FDOC at DeSoto CI.  He is sued in his individual capacity.

9.     Defendant S. Wicker ("Off. Wicker") was at all material times a corrections officer for FDOC at DeSoto CI.  He is sued in his individual capacity.

10.     Defendant Jason Schueneman ("Sgt. Schueneman") was at all material times a corrections officer Sergeant for FDOC at DeSoto CI.  He is sued in his individual capacity.

11.     Defendant Landers ("Off. Landers") was at all material times a corrections officer for FDOC at DeSoto CI.  He is sued in his individual capacity.

12.     Prison officials, including all individually named Defendants, were employees or agents of FDOC.  At all material times, they were under the control and supervision of FDOC and acted within the scope of their employment or agency.

13.     Each Defendant at all instances relevant to this complaint acted under color of law.

## FACTS

### A. The Seizure

14.     At all relevant times, Higgins had epilepsy and a history of grand mal epileptic seizures.  Prior to the alleged prison rule violations of Sept. 27, 2018, Higgins's prison medical records reflected a history of seizures and past treatment for epilepsy.

15.     Epileptic seizures may cloud awareness, block normal communication and produce a variety of undirected, involuntary, and unorganized movements. These seizures may have symptoms that may be erroneously perceived as combative, including screaming, running, flailing, unnatural looking movements of the arms or legs, spitting, shouting, and abusive statements. All of these are involuntary and unconscious symptoms of seizures.

16.     Notwithstanding Higgins's known history of a seizure disorder, neither the FDOC, Warden Jones, nor any DeSoto CI correctional officer implemented appropriate training relating to responses to a seizure.

17.     On the morning of Sept. 27, 2018, Higgins had an epileptic seizure, in the E-dormitory at DeSoto CI.

18.     That morning, inmates alerted Officer Charleston that Higgins was on the bathroom floor.  She went to the bathroom and saw Higgins.  Higgins appeared to Off. Charleston to be having a seizure.  Off. Charleston radioed and requested assistance of additional corrections officers and medical personnel.

19.    Officer Jessica Tirado and Sgt. Schueneman responded to E-dormitory.  They attempted to mechanically restrain[1] Higgins.  One or both rolled him onto his chest to handcuff his hands behind his back.

20.    DeSoto CI prison officials failed to provide proper seizure-care to Higgins.  They failed to prevent Higgins from choking or otherwise injuring himself during his grand mal seizure.

(a)    A person experiencing an epileptic seizure should not be mechanically restrained.  The use of restraints to control a person experiencing an epileptic seizure or restraining him face-down can prompt the person to involuntarily struggle and lead to injury, asphyxiation, and/or cardiac arrest.

(b)    When properly trained and directed, prison officials can provide proper emergency care to a person experiencing an epileptic seizure.  Proper care may include giving the individual epilepsy medicine, giving the individual glucose if they are hypoglycemic individual, clearing the airway, hemorrhage control, or CPR.  To prevent the tongue, saliva, or liquids in the mouth from blocking the

---

[1] "Mechanically restrain," as used in this complaint, describes the use of a physical or mechanical device to control the movement of a person's body or limbs, including, but not limited to, the use of flex cuffs, soft restraints, hard metal handcuffs, a black box, chubb cuffs, leg irons, belly chains, a security or tether chain, or a convex shield.

airway, a responder should turn the individual on one side.  This allows gravity to keep the airway clear of the tongue and any fluids in the mouth.

(c)     FDOC failed to adequately train DeSoto CI prison officials how to recognize and properly care for persons experiencing a seizure.

21.     One or more persons alerted Off. Tirado, Sgt. Schueneman, and other responding officers that Higgins was having a seizure.  Off. Tirado and Sgt. Schueneman did not cease trying to mechanically restrain Higgins.

22.     During this incident, when Off. Tirado attempted to mechanically restrain Higgins, he clenched his jaws and reportedly bit her.

23.     During the seizure, Higgins bit and injured his tongue, and was treated for the injury at the prison medical center.  The biting of one's tongue is a common injury during a seizure.

24.     Because Higgins was mechanically restrained during his seizure, Higgins suffered abrasions and bruising on his ankles and wrists.

25.     Off. Tirado attempted to restrain Higgins before he reportedly had bitten her.

26.     Medical personnel responded to E-dormitory within about 5 minutes after Off. Charleston first saw Higgins on the floor.

27.    Later on Sept. 27, 2018, Higgins reported to medical staff that he had a history of seizures and had just had a seizure earlier that morning.

28.    Later that day, he told FDOC Inspector Greg Fulcher, Office of the Inspector General, that he has a history of seizures and had just had a seizure to explain the alleged prison rule violations of Sept. 27, 2018.

29.    On Sept. 29, 2018, Higgins experienced another seizure.  On Sept. 29, 2018, FDOC medical personnel prescribed and administered him Dilantin, which is anti-seizure medication used to treat epilepsy.  These were contemporaneously noted in Higgins's prison medical file.

30.    On Oct. 1, 2018, Higgins experienced another seizure and was admitted to the prison's infirmary.  On Oct. 1, 2018, FDOC medical personnel prescribed and administered him Tegretol, a different anti-seizure medication used to treat epilepsy.  This was contemporaneously noted in Higgins's prison medical file.

**B. Higgins's Autism**

31.    Autism Spectrum Disorder ("Autism") is a lifelong neurodevelopmental condition characterized by deficits in communication and social interaction, as well as a restricted repertoire of activities and interest.

32.     Autism has a range of associated deficits that vary widely, including: difficulty in reading emotions on the faces of others, nonverbal communication, social interactions, and motor coordination; a tendency to state what they think without regard for social consequences; idiosyncratic interests; literal interpretation of language; and an ability to be honest to the point of offending others.

33.     People with Autism are often highly sensitive to their environments, including unusually sensitive sensory systems, meaning that their senses sight, hearing, touch, smell, and taste can all be easily overloaded.

34.     From the inception of his incarceration, FDOC, Warden Jones, and other DeSoto CI correctional officers had knowledge that Higgins was Autistic.

35.     Because of Higgins's inability to advocate for himself, Higgins requested that his mother Sarah Higgins advocate on his behalf.  Higgins's mother called Warden Jones and others at DeSoto CI multiple times and sent emails, to advise that Higgins was Autistic, and as a result would be severely depressed and confused with the unfamiliar environment.

C. **Isolation as a result of his seizure**

36.     Higgins was charged with violating prison rules during the incident on Sept. 27, 2018.

37.     On Oct. 2, 2018, DeSoto CI's disciplinary team conducted a disciplinary hearing on the alleged prison rule violations of Sept. 27, 2018.  During this hearing, Higgins explained that he has epilepsy and a history of epileptic seizures.  Higgins protested that he had a seizure and his alleged disciplinary violations were involuntary.  DeSoto CI prison official S.L. Durie rejected Higgins's defense, responding that Higgins had no medical history record of epileptic seizures.  However, Durie encouraged Higgins to file a grievance to alert prison officials that he has epilepsy, a history of epileptic seizures, and that he had one on Sept. 27, 2018.  She explained that Higgins would not properly be disciplined for an involuntary act.

38.     The disciplinary team adjudicated Higgins guilty of the alleged prison rule violations of Sept. 27, 2018, and recommended no less than 60 days of disciplinary confinement as punishment.

39.     Warden Jones approved the disciplinary team's recommendation and punished Higgins with no less than 60 days of disciplinary confinement as punishment.  *See* Fla. Admin. Code Ann. r. 33-601.309(2).

40.     Higgins's disciplinary confinement did not enlarge his duration of confinement.

41.    On Oct. 3, 2018, DeSoto CI's Institutional Classification Team (ICT) held a hearing to consider changing Higgins's custody classification because of the alleged prison rule violations of Sept. 27, 2018.  *See* Fla. Admin. Code Ann. r. 33-601.800(3)(g).  The ICT consists of the warden or assistant warden, classification supervisor, and chief of security.  *See* Fla. Admin. Code Ann. r. 33-601.209. Colonel J. Morales was a member of that ICT.

42.    At the ICT hearing, Higgins explained that he has epilepsy and a history of epileptic seizures.  Higgins protested that he had a seizure and his alleged disciplinary violations were involuntary.  The ICT recommended Higgins's custody classification be changed to Close Management I (CM1) because of the result of the disciplinary hearing.  CM1 is "the most restrictive single cell housing level of all the close management status designations."  Fla. Admin. Code Ann. r. 33-601.800(2)(a)(1).  Soon after, the ICT's recommendation was approved, and Higgins's custody classification was changed to CM1.

43.    In early October 2018, Higgins filed a number of grievances contesting the imposition of disciplinary confinement as punishment.  He explained he has a history of seizures; he was having a seizure when he reportedly bit Off. Tirado; and he has experienced seizures since Sept. 27, 2018.  Warden Jones rejected these grievances.

44.    On Nov. 27, 2018, Higgins's counsel alerted Warden Jones and Kenneth Steely (General Counsel for FDOC) that Higgins has a diagnosis of epilepsy and has several seizures while at DeSoto CI.

45.    Warden Jones had the authority to direct the disciplinary team to conduct a rehearing because of new evidence.  *See* Fla. Admin. Code Ann. r. 33-601.309(4) & 33-601.310(1).  Nevertheless, Warden Jones did not direct a rehearing and left in place Higgins's punishment by disciplinary confinement, which left Higgins in isolation.

46.    Warden Jones had the authority to reconvene an ICT to review Higgins's custody classification.  Warden Jones had the authority to elect to serve on the ICT.  Nevertheless, Warden Jones failed to reconvene the ICT and elect to serve on it and left in place Higgins's custody classification as CM1, which left Higgins in isolation.

### D. **Isolation conditions**

47.    Because of the alleged prison rule violations of Sept. 27, 2018, FDOC detained Higgins in isolation for approximately 225 days (7½ months) from Sept. 27, 2018, through May 10, 2019, when he was released

(a)     From Sept. 27, 2018, through Oct. 2, 2018, Higgins was held in administrative confinement because of the alleged prison rule violations of Sept. 27, 2018.

(b)     For no less than the 60 days following Higgins's disciplinary hearing on Oct. 2, 2018, Higgins was held in disciplinary confinement because of the alleged prison rule violations of Sept. 27, 2018.

(c)     After Higgins's disciplinary confinement ended, Higgins remained in isolation as a result of his custody classification that was amended because of the alleged prison rule violations of Sept. 27, 2018.

(d)     Higgins was detained at DeSoto CI from Sept. 27, 2018, through approximately March 14, 2019.

(e)     On or about March 14, 2019, Higgins was transferred from DeSoto CI to Florida State Prison in Raiford, Florida.  He remained detained at Florida State Prison until his release.  Florida State Prison houses one of Florida's three death row cell blocks and Florida's execution chamber.

48.     During this time in isolation, Higgins was largely detained in cells with the following characteristics:

(a)     His cell measured approximately six by eight feet, or approximately 50 square feet.  The American Correctional Association standard for isolation cells is 80 square feet.

(b)     The walls were monotone concrete aside from rust and mold. Prison officials prohibited him from hanging any personal items, such as photographs or drawings, on the walls.  The cells did not have mirrors for Higgins to see himself.  There were no wall clocks.  The walls were barren.

(c)     The cells in DeSoto CI had a window that could only be opened 1 inch and only through this opening could Higgins receive fresh air and see a view of barbed wire, but no nature.

(d)     The cells were not air conditioned and were improperly climate controlled.  When it was hot outside, it was hot in the cell; when it was cold outside, it was cold in the cell.  Higgins was not provided extra cloths to keep warm or permitted to remove cloths to cool off.

(e)     Confinement units were loud.  In addition to the exhaust fans, prison staff slammed doors and knocked metal restraints and keys on steel throughout the unit.  They yelled at people, and people yelled back.  Automatic door locks popped loudly and frequently.  Chains rattled as people in full restraints shuffle through the unit.  People experiencing mental health symptoms in nearby

cells howled, screamed, and talked to themselves or anyone who would listen. People pounded on their doors to get the attention of staff for legitimate concerns, or as an emotional release.

(f)     Prison staff controlled the lights inside cells.  Lights were turned off late at night and back on early in the morning for a period of darkness totaling only four to six hours.  At DeSoto CI, prison staff would often only turn the lights off at 1:00 or 2:00 am and turn them back on at 4:00 am for breakfast. The cell's artificial lights made sleeping difficult especially because Higgins was prohibited from covering his eyes from the light to sleep.  Higgins was sleep deprived.

49.    During this time in isolation, Higgins was permitted few possessions.

(a)     He had no change of clothes at DeSoto CI.  At Florida State Prison he was permitted only three changes of cloths.

(b)     At DeSoto CI, he was permitted no reading material (aside from a scriptural and devotional materials).  At Florida State Prison, he was permitted limited reading materials and property.

(c)     He was not permitted a tablet, TV, or radio.

50.     During this time in isolation, Higgins was prohibited from participating in any form of communal worship or prayer.  He never spoke with a Chaplin at DeSoto CI.  At Florida State Prison, Higgins he spoke with the Chaplin through a cell door.  Before his time in isolation, he regularly attended a Sunday prayer group.

51.     During this time in isolation, at DeSoto CI, sewage would backup in the units and raw sewage would seep into Higgin's cell, at times a number of inches deep.

52.     During this time in isolation, Higgins was deprived of normal human contact and normal physical touch.  In the general population, people have many opportunities to communicate with other incarcerated people, correctional officers, family members, healthcare staff, religious clergy, teachers, and work supervisors.  They can engage in such communications without mechanical restraints or physical barriers between them.  In contrast, Higgins rarely had these opportunities.

(a)     Prison officials prohibited Higgins from trying to communicate with incarcerated people in other cells—shouting is prohibited by rule, and quiet conversations between cells was nearly impossible.

(b)     Prison officials required medical staff to shout through Higgins's cell door and Higgins to shout responses back.  Higgins could not have frank discussions through a heavy solid door, in part because he did not want to shout personal information that could be heard by other incarcerated people and correctional staff.

(c)     Higgins was prohibited from standing and looking out his cell door or window for more than a few minutes.

53.     During this time in isolation, Higgins ate, slept, and defecated in his small cell.  Instead of eating communally in dining halls, he had to wait for his food to be delivered on a tray through the slot in the door.  He had to eat on his beds or the floor, mere inches from his toilet.  The toilet flushes were timed and controlled by correctional officers.  Thus, Higgins often had to eat his meals accompanied by the smell of feces and urine stagnating in his unflushed toilets.

54.     During the first 10 days in isolation, DeSoto CI prison officials regularly failed to deliver Higgins lunch and dinner.  They tormented him by banging on his door, cursing at him, and telling him that Higgins would not get out of isolation.

55.     During this time in isolation, Higgins was only permitted to leave his isolation cell for five- to ten-minute showers at DeSoto CI three times a week and at Florida State Prison once a week.

56.     Other than the showers, in 7½ months Higgins only left his isolation cell less than a couple dozen times for meetings with his attorney, a classifications officer, or medical personnel.

57.     During this time in isolation, Higgins was deprived of environmental stimulation and was forced to remain idle.  He spent his time slowly eating meals, repeatedly brushing his teeth, and staring at the wall.

58.     During this time in isolation, Higgins was deprived of a proper way to exercise.

        (a)     His cell was too small to engage in meaningful exercise.

        (b)     Although FDOC rules permitted Higgins to exit his isolation cell three times per week, DeSoto CI prison officials regularly denied Higgins recreation privilege without explanation.  He was only permitted to leave his cell for recreation twice at DeSoto CI.  Florida State Prison officials denied Higgins recreation privilege based on minor or pretextual violations, e.g., Higgins placed his toothbrush on his soap dish instead of having it in his hand when called for

recreation.  After ten attempts to go to recreation and being denied each time, Higgins stopped requesting recreation.  He was never permitted to leave for exercise at Florida State Prison.

59.  During this time in isolation, Higgin was subjected to degrading and dehumanizing security measures.  FDOC's use of restraints, cell searches, strip searches, exercise cages, dayroom cages, and non-contact visiting booths are not based on individualized assessments of safety and security threats.

(a)  When he left his isolation cell, Higgins was restrained in black metal devices ("black boxes") that cover the handcuff chain and keyholes.  The black box was often used in combination with a belly chain that fixes the handcuffs at waist level, creating a more rigid and severe restraint that prevent him from freely moving his hands and arms beyond his waist.  The black box caused Higgins pain.  He was also restrained in leg irons on his ankles—which forced him to take very short steps or shuffle their feet.

(b)  Higgins was required to be restrained during medical exams and attorney visits.

(c)  Higgins was cut and bruised on wrists and ankles by these restraints.

(d)     Higgins was subject to strip and cell searches when he left his isolation cell.  During strip searches, correctional staff forced him to remove all clothes, squat, and cough in the presence of others; prison officials subjected Higgins to hand searches of genitals, ears, and hair.  During cell searches, staff went through his belongings, often scattering his papers, opening and emptying their hygiene products, at times tearing pages from photo albums, and generally making a mess of their cells.

**E.  <u>Effect of Isolation</u>**

60.     Solitary confinement, also known as "isolation," is increasingly recognized by medical and mental health professionals, scholars, scientists, and advocates throughout the United States and around the world as torture. Individuals subject to isolation are more likely to exhibit anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality.  These effects begin to manifest within hours or days of isolation, worsening with time and causing permanent damage to individuals, especially those who linger in isolation for months or years. Isolation inflicts devastating harm on the individuals who experience it, places them and their families and communities at risk when they are released, is inordinately expensive when appropriately staffed, and does not reduce prison violence or promote public safety.

61.     For a person with Autism, isolation is recognized as being a particularly toxic setting that not only fails to provide equal access to programs, services and activities, but can cause additional long-lasting harm to his mental health and on his ability to perform daily living skills.  Higgins suffered greater harm in isolation as a result of his Autism.

62.     Before and after his time in isolation, Higgins's mother Sarah Higgins advised Desoto CI medical staff, Warden Jones, and other prison officials of Higgins's Autism diagnosis, the difficulty with adjustment to new surroundings and the propensity for depression and confusion.  In response to this request for a change in environment, Warden Jones responded, "We have mental health staff assigned to the institution who are highly trained and certified in evaluating and treating a myriad of issues within the inmate population."

63.     However, despite such assurances, no accommodation, therapy, or other efforts were made by Warden Jones, the mental health staff, or other person to mitigate the additional trauma suffered by Higgins as a result of the isolation.

64.     During this time in isolation, Higgins's grandfather (with whom he had a close relationship) died.  Because Higgins was in isolation, his ailing grandfather could not visit him.  Higgins never got to say goodbye.

65.     During this time in isolation, Higgins was injured by this period of isolation and deprived of the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities of FDOC.  He was sad, was depressed with suicidal ideation, and suffered other psychological maladies. Today, he continues to suffer psychological adverse effects of this prolonged isolation.  For example, he regularly walks three paces, turns, and then walks three more paces, like he is still in isolation.

66.     Because Higgins was detained, he was unable to mitigate his injuries by seeking medical care outside that approved by FDOC.

### F. __Deliberate Indifference__

67.     The discrimination against and the treatment of Higgins was intentional, with reckless disregard, and with deliberate indifference to his protected rights.

68.     FDOC (through Warden Jones, the ICT, and the disciplinary team) and Warden Jones each violated Higgins rights protected by the ADA, Rehabilitation Act, the Cruel and Unusual Clause, and the Equal Protection Clause with discriminatory intent and through deliberate indifference.

(a)     FDOC and Warden Jones each knew that Higgins had epilepsy and likely had a seizure during the alleged prison rule violations of Sept. 27, 2018.

(b)   FDOC and Warden Jones each knew that Higgins had Autism.

(c)   FDOC and Warden Jones each knew that the effect of their actions or omissions would result in Higgins being placed in isolation.

(d)   FDOC and Warden Jones each knew the cumulative effect of isolation—including the lack of human contact, lack of exercise, lack of environmental stimulation, cell conditions, and oppressive security measures— subjects people to a substantial risk of serious harm.  The substantial risk was obvious.

(e)   FDOC and Warden Jones each knew that Higgins's Autism would make the adverse effects of isolation worse.  The compounded substantial risk was obvious.

(f)   FDOC and Warden Jones each knew that placing Higgins in isolation because of an involuntary act brought on by his disability—reportedly biting a guard during an epileptic seizure—would result in an injury and failed to act on that likelihood.

(g)   The disciplinary team made a deliberate choice to recommend, and Warden Jones made a deliberate choice to approve, the discipline of Higgins

with disciplinary confinement for the alleged prison rule violations of Sept. 27, 2018 because of the involuntary act brought on by his disability.

(h)    The ICT made a deliberate choice to classify Higgins as CM1 because of the involuntary act brought on by his disability.

(i)    Warden Jones made a deliberate choice to fail to direct the disciplinary team to conduct a rehearing and reconvene the ICT to reconsider Higgins's custody classification.

69.    As a direct and proximate result of FDOC's, its employees', and its agents' actions and omissions resulting in Higgins being placed in isolation, Higgins suffered psychological injuries; mental pain, suffering, and anguish; and embarrassment and humiliation.

### COUNT 1:  EIGHTH AMENDMENT: EXCESSIVE FORCE
(Johnson & Wicker)

70.    Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-30.

71.    Off. Johnson and Off. Wicker deprived Higgins of the rights secured by the Eighth Amendment to the U.S. Constitution, which may be remedied pursuant to 42 U.S.C. § 1983. The Eighth Amendment to the U.S. Constitution prohibits prison officials from using excessive force against an inmate.

72.     After the alleged prison rule violations of Sept. 27, 2018, Off. Johnson and Off. Wicker transported Higgins from E-dormitory to medical.  They had control over Higgins during this transport.

73.     Pursuant to FDOC policy, prison officials should as soon as possible use a video camera to visually and auditorily record reactionary use of force.  *See* Fla. Admin. Code Ann. r. 33-602.210(4)(c)(2).  However, DeSoto CI prison officials did not begin recording the use of force on Higgins until at least 38 minutes after the first use of force on Higgins on Sept. 27, 2018.  Furthermore, recordings should continue uninterrupted.  *See* Fla. Admin. Code Ann. r. 33-602.210(4)(c)(1).  However, the recording of use of force on Higgins on Sept. 27, 2018, contains an interruption for at least 8 minutes.

74.     After Higgins was mechanically restrained inside E-dormitory, Off. Johnson and Off. Wicker removed him to outside the housing unit and brought him to the side of the dormitory.  At the time, Higgins was subdued, incapacitated, and otherwise not resisting.

75.     Off. Johnson applied excessive force against Higgins or, in the alternative, was in a position to intervene to prevent the application of excessive force against Higgins and failed to do so.

76.     Off. Wicker applied excessive force against Higgins or, in the alternative, was in a position to intervene to prevent the application of excessive force against Higgins and failed to do so.

77.     Excessive force was applied maliciously and sadistically against Higgins with the intent to cause harm and in a way that is repugnant to the conscience of mankind.  The application of force against Higgins was unnecessary and not in a good-faith effort to maintain or restore discipline or order or for any other penological reason.

78.     On information and belief, they sought revenge because they understood Higgins had purposefully bit Off. Tirado that morning.  In the infirmary, Off. Johnson told Higgins that Higgins was "lucky that is all that happened to you."

79.     As a direct and proximate result of this application(s) of excessive force and battery, Higgins suffered physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 2: STATE-LAW BATTERY
### (Johnson & Wicker)

80.     Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-30, 72-78.

81.     Off. Johnson intentionally struck Higgins with excessive, harmful, and offensive contact against Higgins's will or, in the alternative, conspired to batter Higgins by agreeing to participate in the battery by serving as a look-out or providing other support.

82.     Off. Wicker intentionally struck Higgins with excessive, harmful, and offensive contact against Higgins's will or, in the alternative, conspired to batter Higgins by agreeing to participate in the battery by serving as a look-out or providing other support.

83.     As a direct and proximate result of this application(s) of excessive force and battery, Higgins suffered physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 3: EIGHTH AMENDMENT: EXCESSIVE FORCE
### (Schueneman & Landers)

84.     Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-30.

85.     Sgt. Schueneman and Off. Landers deprived Higgins of the rights secured by the Eighth Amendment to the U.S. Constitution, which may be remedied pursuant to 42 U.S.C. § 1983. The Eighth Amendment to the U.S. Constitution prohibits prison officials from using excessive force against an inmate.

86.     On the morning of Sept. 27, 2018, Sgt. Schueneman went to the E-dormitory to assist in the response to Higgins.

87.     After Higgins was restrained, including with handcuffs behind his back, Sgt. Schueneman lifted Higgins by pulling up him up by his hands. Sgt. Schueneman applied excessive force against Higgins by over-extending Higgins's shoulder rotation, causing Higgins long-lasting injuries.

88.     Later that morning, Higgins felt intense pain in his shoulders in the prison infirmary.  Off. Schueneman was the cause of this pain and injury.

89.     Later on Sept. 27, 2018, Off. Landers and others transported Higgins to the county jail for DeSoto County, Florida.

90.     At the jail Higgins was charged and booked for battery on a corrections officer.  On Jan. 11, 2019, the state prosecutor filed a nolle prosequi

dismissing its prosecution for this charge. *See State v. Higgins*, No. 14 2018 CF

000466 (Fla. 12th Cir. DeSoto Cty.)

91.     During the transport, Off. Landers demanded Higgins walk faster.

Higgins was in restraints.  When Higgins was unable to comply, Off. Landers

lifted high Higgins's shackled wrists to force him to walk faster.  Off. Landers

applied excessive force against Higgins by over-extending Higgins's shoulder

rotation, causing Higgins long-lasting injuries.

92.     On information and belief, Sgt. Schueneman and Off. Landers sought

revenge because they understood Higgins had purposefully bit Off. Tirado that

morning.  Off. Landers told Higgins that he was lucky he was not worse from the

battery earlier that morning and that Off. Tirado was related to Off. Landers.

93.     Other than Off. Schueneman and Off. Landers, no other corrections

officer over-extended Higgins's shoulder rotation.

94.     Excessive force was applied maliciously and sadistically against

Higgins with the intent to cause harm and in a way that is repugnant to the

conscience of mankind.  The application of force against Higgins was unnecessary

and not in a good-faith effort to maintain or restore discipline or order or for any

other penological reason.

95.     As a direct and proximate result of this application(s) of excessive force and battery, Higgins suffered physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 4:  STATE-LAW BATTERY
(Schueneman & Landers)

96.     Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-30 and 86-93.

97.     Sgt. Schueneman intentionally over-extended Higgins's shoulder rotation with excessive, harmful, and offensive contact against Higgin's will.

98.     Off. Landers intentionally over-extended Higgins's shoulder rotation with excessive, harmful, and offensive contact against Higgin's will.

99.     As a direct and proximate result of this application(s) of excessive force and battery, Higgins suffered physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 5:  AMERICANS WITH DISABILITIES ACT
(FDOC)

100.    Plaintiff realleges and incorporates by reference the foregoing allegations.

101.    FDOC violated the ADA by discriminating against Higgins because of his disabilities. *See* 42 U.S.C. § 12132.

102.    Epilepsy and Autism are disabilities for purposes of the ADA.

103.    Through the operation of its prisons, FDOC provides various "services, programs, and activities," *see* 42 U.S.C. § 12132, including safe and effective housing, meals, recreation, sanitation, canteen, dayroom time to socialize with others, access to a library, work opportunities, education and vocational programs, hygiene items, reading materials, personal property, telephone and visitation privileges, and medical care.

104.    At all relevant times, Higgins met the essential eligibility requirements for the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities provided by FDOC.  Higgins was a qualified individual with a disability within the meaning of the ADA.  *See* 42 U.S.C. § 12131(2)

105.   Because of Higgins's disability (epilepsy), FDOC detained Higgins in isolation for approximately 225 days (7½ months) from Sept. 27, 2018, through May 10, 2019, when he was released

106.   During this time in isolation, FDOC deprived Higgins by reason of his disabilities of the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities that FDOC provides to inmates without disabilities, or otherwise discriminated against him.

107.   During this time in isolation, FDOC deprived Higgins by reason of his disabilities of the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities that FDOC provides to inmates not in isolation, or otherwise discriminated against him.

108.   During this time in isolation, by reason of his disabilities, FDOC discriminated against Higgins and treated him differently from those not in isolation.

109.   FDOC failed to adequately house Higgins in a placement that met the needs of his epilepsy and Autism.  FDOC failed to recognize and place Higgins in a facility that is designed to accept inmates with either epilepsy or Autism and with prison officials trained about these disabilities.  FDOC failed to train DeSoto CI

prison officials to how to properly identify and care for inmates with epilepsy and Autism.

110.   FDOC failed to train DeSoto CI prison officials how to recognize and apply proper restraint protocols for a person with epilepsy.

111.   As a result, (a) Higgins was placed in isolation as a result of the involuntary act brought on by his disability (epilepsy) and (b) Higgins was battered and subjected to excessive force as a result of an involuntary act brought on by his disability (epilepsy).

112.   FDOC failed to train DeSoto CI prison officials how to recognize and care for a person with Autism.  After Sept. 27, 2018, Higgins's mother continued to request a reasonable accommodation because Higgins had Autism.  FDOC, its employees, and agents (including Warden Jones) knew Higgins's mother's requests and his need for a reasonable accommodation because of his developmental disability.  Despite these requests for an accommodation because of his Autism, his placement was not adjusted, and any accommodations were denied. As a result, Higgins suffered more severe consequences of isolation.

113.   Warden Jones had actual knowledge of Higgins disabilities, and notwithstanding such notice, and knowledge of the FDOC's policies against

disability discrimination, proceeded to permit the discrimination and isolation of Higgins to continue until his release.

114.   Furthermore, by having explicit policies relating to non-discrimination against persons with disabilities and then disregarding the protected rights of persons with known and disclosed disabilities by failing to implement such policies, FDOC is vicariously liable through their employees' egregious discrimination against Higgins.

115.   FDOC, its employees, and agents knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.

116.   As a direct and proximate result of FDOC's, its employees', and its agents' discrimination, Higgins suffered psychological injuries; physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 6:  REHABILITATION ACT
### (FDOC)

117.   Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-99, and 105-115.

118.   FDOC violated the Rehabilitation Act by discriminating against Higgins because of his disabilities.  *See* 29 U.S.C. § 794.

119.   Epilepsy and Autism are disabilities for purposes of the Rehabilitation Act.

120.   Through the operation of its prisons, FDOC provides various programs and activities receiving Federal financial assistance, *see* 29 U.S.C. § 794, including safe and effective housing, meals, recreation, sanitation, canteen, dayroom time to socialize with others, access to a library, work opportunities, education and vocational programs, hygiene items, reading materials, personal property, telephone and visitation privileges, and medical care.

121.   At all relevant times, Higgins met the essential eligibility requirements for the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities provided by FDOC.  Higgins was a qualified individual with a disability within the meaning of the Rehabilitation Act.

122.   As a direct and proximate result of FDOC's, its employees', and its agents' discrimination, Higgins suffered psychological injuries; physical injuries and impairments; medical expenses; loss of earning capacity; mental pain, suffering, and anguish; and embarrassment and humiliation.

## COUNT 7:  EIGHTH AMENDMENT: CRUEL & UNUSUAL PUNISHMENT
(Warden Jones)

123.   Plaintiff realleges and incorporates by reference the allegations in the following paragraphs: 1-69.

124.   Warden Jones deprived Higgins of the rights secured by the Eighth Amendment to the U.S. Constitution, which may be remedied pursuant to 42 U.S.C. § 1983.  The Eighth Amendment to the U.S. Constitution prohibits Warden Jones from inflicting cruel and unusual punishment.

125.   During this time in isolation, Higgins was deprived of the minimal civilized measure of life's necessities and human dignity.  The isolation of Higgins was unnecessary and not in a good-faith effort to maintain or restore discipline or order or for any other penological reason.  The isolation resulted in the unnecessary and wanton infliction of pain.

126.   Warden Jones approved and left in place Higgins's disciplinary confinement and custody classification change to CM1 that resulted in Higgins's being placed insolation after ignoring his disability that caused the alleged prison rule violations of Sept. 27, 2018.

127.   As a direct and proximate result of Warden Jones's treatment, Higgins

suffered psychological injuries; mental pain, suffering, and anguish; and

embarrassment and humiliation.

### COUNT 8:  FOURTEENTH AMENDMENT: EQUAL PROTECTION
(Warden Jones)

128.   Plaintiff realleges and incorporates by reference the allegations in the

following paragraphs: 1-69.

129.   Warden Jones deprived Higgins of the rights secured by the

Fourteenth Amendment to the U.S. Constitution, which may be remedied pursuant

to 42 U.S.C. § 1983.  The Fourteenth Amendment to the U.S. Constitution

prohibits Warden Jones from intentionally treating Higgins differently than others

similarly situated without a rational basis.

130.   During this time in isolation, Higgins was treated less favorably from

other similarly situated individuals.  Inmates who were not detained in isolation did

not endure the adverse conditions of isolation.

131.   Warden Jones had no rational or reasonable basis to place Higgins in

isolation.  Warden Jones approved and left in place Higgins's disciplinary

confinement and custody classification change to CM1 that resulted in Higgins's

being placed insolation after ignoring his disability that caused the alleged prison

rule violations of Sept. 27, 2018. Warden Jones's discriminatory treatment was based on Higgins's disability.

132.   As a direct and proximate result of Warden Jones's discrimination, Higgins suffered psychological injuries; mental pain, suffering, and anguish; and embarrassment and humiliation.

<u>**RELIEF REQUESTED**</u>

**WHEREFORE**, Plaintiff respectfully request the following relief:

A.   An order awarding Higgins compensatory damages to compensate him for physical injuries; psychological injuries; mental pain, suffering, and anguish; embarrassment and humiliation; and violation of his disability-related rights:

(1)   Order FDOC to pay compensatory damages to Higgins for his injuries resulting from (a) prison officials' use of excessive force and battery, (b) his isolation, and (c) his deprivation of the enjoyment from the participation in and the receipt of the benefits of these services, programs, and/or activities provided by FDOC.

(2)   Order Warden Jones to pay compensatory damages for Higgins's injuries resulting from his isolation.

(3)     Order Off. Johnson and Off. Wicker, jointly and severally, to pay compensatory damages for Higgins's injuries resulting from the excessive force and battery against Higgins.

(4)     Order Sgt. Schueneman and Off. Landers, jointly and severally, to pay compensatory damages for Higgins's injuries resulting from the excessive force against Higgins and the over-extension of his shoulder rotation.

B.     An award to Plaintiff from the Defendants of reasonable costs, attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, or a combination of these statutes;

C.     An order retaining the Court's jurisdiction of this matter to enforce the terms of the Court's orders; and

D.     Such further and different relief as is just and proper or that is necessary to make the Plaintiff whole.

Respectfully Submitted,

s/Benjamin James Stevenson
**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Found. of Fla.
3 W. Garden St., Suite 712
Pensacola, FL  32502-5636
T. 786.363.2738
bstevenson@aclufl.org

**Matthew W. Dietz**
Fla. Bar. No. 84905
Disability Independence Group, Inc.
2990 Southwest 35th Avenue
Miami, Florida 33133
T. 305.669.2822
mdietz@justdigit.org

**Daniel Tilley**
Florida Bar No. 102882
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400
Miami, FL 33134
T. 786.363.2714
dtilley@aclufl.org

*Counsel for Plaintiff Higgins*